439

Argued and submitted November 10, 2003, reversed and remanded
January 21, 2004

Cheryl PERRIN,
Charles P. Duffy, and David W. Sherman,
*Appellants,*

*and*

Kate BROWN
and Dan Gardner,
*Intervenors - Appellants,*

*v.*

John KITZHABER,
in his official capacity as
Governor of Oregon;
and Bill Bradbury,
in his official capacity as
Secretary of the State of Oregon,
*Respondents.*

Jason ATKINSON,
Roger Beyer, William Fisher,
John Minnis, Charles Starr,
and the Oregon Republican Party,
*Appellants,*

*and*

Kate BROWN
and Dan Gardner,
*Intervenors - Appellants,*

*v.*

STATE OF OREGON,
John Kitzhaber,
in his official capacity as
Governor of Oregon;
and Bill Bradbury,
in his official capacity as
Secretary of the State of Oregon,
*Respondents.*

0107-07021, 0107-07120; A118103

83 P3d 368

Julia E. Markley argued the cause for appellants Cheryl Perrin, Charles P. Duffy, and David W. Sherman. With her on the opening brief were Michael H. Simon, Elizabeth Schwartz, Thomas R. Johnson, Jr., and Perkins Coie LLP. With her on the reply brief were Michael H. Simon and Perkins Coie LLP.

John DiLorenzo, Jr., argued the cause for appellants Jason Atkinson, Roger Beyer, William Fisher, John Minnis, Charles Starr, and the Oregon Republican Party. With him on the opening brief were Aaron K. Stuckey and Hagen Hirschy DiLorenzo & Grein, P.C. With him on the reply brief were Aaron K. Stuckey and Davis Wright Tremaine LLP.

Thane W. Tienson argued the cause for intervenors - appellants. With him on the briefs was Landye Bennett Blumstein LLP.

Richard D. Wasserman, Attorney-in-Charge, Civil/Administrative Appeals Unit, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

In these consolidated actions involving redistricting of Oregon's congressional districts, plaintiffs Cheryl Perrin, Charles P. Duffy, and David W. Sherman (the Perrin plaintiffs), Jason Atkinson, Roger Beyer, William Fisher, John Minnis, Charles Starr, and the Oregon Republican Party (the Atkinson plaintiffs), and intervenors Kate Brown and Dan Gardner all appeal, challenging the trial court's refusal to award them attorney fees and costs pursuant to 42 USC section 1988. The trial court denied attorney fees and concluded that (1) the Atkinson plaintiffs had not "prevailed"; and (2) the Perrin plaintiffs and intervenors, while "prevailing," fell within a "special circumstances" exception to entitlement to fees under that statute. As described below, we conclude that all parties "prevailed" for purposes of section 1988 and that no "special circumstances" exception to fee entitlement applies. Accordingly, we remand for the trial court to determine the reasonableness of plaintiffs' and intervenors' fees incurred in litigating all issues, including the scope and nature of the remedy.

The pertinent facts are undisputed. The 2000 decennial census showed a shift in Oregon's population that resulted in a malapportioned distribution among the then-existing congressional districts. *See* ORS 188.135 (2001) (describing areas encompassed within Oregon's congressional districts that were in effect as of December 18, 1991). Consequently, the legislature undertook to redraw the congressional districts. *See* ORS 188.010.[1] Predictably, the

---

[1] ORS 188.010 provides, in part, as follows:

"The Legislative Assembly or the Secretary of State, whichever is applicable, shall consider the following criteria when apportioning the state into congressional and legislative districts:

"(1) Each district, as nearly as practicable, shall:

"(a) Be contiguous;

"(b) Be of equal population;

"(c) Utilize existing geographic or political boundaries;

"(d) Not divide communities of common interest; and

"(e) Be connected by transportation links.

"(2) No district shall be drawn for the purpose of favoring any political party, incumbent legislator or other person.

Democratic and Republican parties offered contending solutions. Towards the end of the 2001 legislative session, with Republicans constituting a majority of both the Senate and the House, the legislature approved the Republican-sponsored plan, Senate Bill (SB) 500, on a strict party-line vote. Then-Governor John Kitzhaber, a Democrat, vetoed SB 500. Unable to override the veto, the legislature adjourned *sine die*, having failed to redraw the congressional districts. That left the existing (1991) districts still in place.

■     In July 2001, with the May 2002 primary election ten months away, the Perrin plaintiffs and the Atkinson plaintiffs filed separate actions in Multnomah County Circuit Court, alleging claims under 42 USC section 1983. Those actions, which named Kitzhaber and Secretary of State Bill Bradbury as defendants, asserted that the existing congressional districts were unconstitutionally malapportioned, in violation of Article I, section 2, of the United States Constitution, as well as the Equal Protection Clause and the Privileges and Immunities Clause of the Fourteenth Amendment.[2] The Perrin plaintiffs represented the interests of the

---

"(3) No district shall be drawn for the purpose of diluting the voting strength of any language or ethnic minority group."

[2] Historically, redistricting litigation had been filed in federal district court, pursuant to 28 USC section 2284(a). However, in *Growe v. Emison*, 507 US 25, 34, 113 S Ct 1075, 122 L Ed 2d 388 (1993), the Court emphasized that the federal constitution requires the states, not federal courts, to take "primary responsibility" for such cases:

" 'We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.' *Chapman v. Meier*, 420 US 1, 27[, 95 S Ct 751, 42 L Ed 2d 766] (1975). Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it."

This directive is one of "deferral, not abstention." *Growe*, 507 US at 37. Thus, although both federal and state courts retain jurisdiction in redistricting cases, *Growe* dictates that, under principles of federalism and comity, the states are to take a "primary" role. *See Jensen v. Wisconsin Elections Bd.*, 249 Wis 2d 706, 639 NW2d 537 (2002) (recognizing *Growe*'s holding, but denying petition to exercise original jurisdiction where doing so could cause conflicts with pending federal court case and cause unnecessary delay in resolving redistricting problems); *Alexander v. Taylor*, 51 P3d 1204 (Okla 2002) (reviewing history of judicial involvement in redistricting cases and noting that, under *Growe*, the states, not federal courts, have the responsibility to see that the right to constitutionally apportioned districts is enforced); *Perry v. Del Rio*, 67 SW3d 85, 88 (Tex 2001) (when concurrent suits are filed in state and federal court, *Growe* requires the federal court to defer

National Democratic Party; intervenors represented the interests of the Oregon Democratic Party; and the Atkinson plaintiffs represented the interests of the Oregon Republican Party.

In both actions, plaintiffs sought both declaratory relief and an injunction prohibiting defendants from ordering or conducting future elections based on the malapportioned districts. However, the parties differed as to the precise remedy. The Perrin plaintiffs and intervenors urged the adoption of the Democratic plan, while the Atkinson plaintiffs urged the adoption of SB 500. Central to that dispute were the criteria prescribed in ORS 188.010. Defendants answered, conceding that the existing districts were unconstitutional, but denying any violation of plaintiffs' constitutional or civil rights. Defendants did not endorse either of the proposed plans or advocate any alternative redistricting plan.

The trial court consolidated the cases for trial and heard two weeks of testimony that focused almost exclusively on the question of how the districts should be redrawn. In early November 2001, the court entered a judgment that (1) declared that the 1991 districts were unconstitutional; (2) permanently enjoined defendants from conducting future congressional elections based on those districts; and (3) adopted the Democratic plan advanced by the Perrin plaintiffs and intervenors, because that plan "minimizes disruption of the existing congressional districts and better complies with the statutory criteria of ORS 188.010." No party appealed from that judgment.

Later in November 2001, all plaintiffs and intervenors petitioned the court for attorney fees, asserting that they had "prevailed" for purposes of section 1988. The Perrin plaintiffs requested costs and attorney fees of $531,739.01; intervenors requested $61,899.96; and the Atkinson plaintiffs requested $144,996.34.

The trial court denied all of the fee requests in their entirety. The court's letter opinion began by addressing which of the parties had "prevailed" for purposes of section

---

to the state process); *Brown v. Butterworth*, 831 So 2d 683 (Fla Dist Ct App 2002) (same).

1988. The court noted that "[a]ll plaintiffs [and intervenors] claim to have prevailed because the court granted the relief sought, namely, an injunction which prohibited the defendants from conducting elections under the then-existing malapportioned congressional districts." The court then stated, without amplification, that the Perrin plaintiffs and intervenors had "prevailed in this litigation for the reason that their plan was adopted by the court." Conversely, the trial court concluded that the Atkinson plaintiffs had not "prevailed":

> "In most cases in which this issue has been examined * * *, the federal courts have been reluctant to confer prevailing party status on the party whose plan is rejected by the court. After consideration of the cases which have examined this issue, this court agrees with that reasoning. The only real issue in this case was which of the two plans should be adopted by the court. Under that analysis, the Perrin and Brown/Gardner plaintiffs were the clear winners. While the evidence produced at trial by the Atkinson plaintiffs was helpful to the court, it did not meet the statutory criteria by which this court was guided in reaching its decision. For that reason, this court cannot find that the Atkinson plaintiffs prevailed as that term is generally understood and applied."

Notwithstanding its determination that the Perrin plaintiffs and intervenors had prevailed, the trial court held that the "special circumstances" of this litigation precluded any award of fees. The court acknowledged that the "federal circuit courts * * * have uniformly held that congressional redistricting cases of this kind present no special circumstances justifying the denial of attorney fees and costs." Nevertheless, the trial court adopted, as persuasive, the reasoning of the dissenting opinion in *Hastert v. Illinois State Bd. of Election Com'rs*, 28 F3d 1430, 1444 (7th Cir 1993), *cert den*, 513 US 964 (1994) (Coffey, J., dissenting). The trial court explained:

> "This court disagrees with the reasoning of those courts and finds that this purely political case does indeed fall within the special circumstances exception to the general rule in favor of awarding attorney fees. It was necessary to file this case only because the members of the legislature,

voting along straight party lines, failed to fulfill their constitutionally-imposed duty to redraw congressional district lines following the 2000 decennial census. No substantial rights were vindicated by this litigation. This is, at its core, a turf war between the two well-funded major political parties. The litigation in this case vindicated primarily their interests and those of the candidates who seek election in the [disputed districts].

"Such interests, while understandable and arguably laudable, are not, in this court's opinion, among those sought to be protected by Congress when it enacted this voting rights legislation. [Section 1988's] goal of inducing 'voluntary compliance with the law' was never at issue in this case. The defendants acknowledged the need to redraw lines from the outset. Unlike the voting rights case in which a suit is necessary to redress wrongs perpetrated by those in a position of power against a disenfranchised group of voters, this case was solely concerned with gaining and/or maintaining political advantage to those who would represent the two major political parties in Oregon's congressional delegation.

"The political parties are entitled to retain, as they did, top-flight attorneys to present their evidence and arguments to the court in an effort to achieve their political ends. They are not, however, entitled to pass along that cost to the taxpayers. To deny the fee-shifting [that would result from awarding] the plaintiffs attorney fees will serve the further goal of encouraging those participating in the legislative process to accomplish the task entrusted to them every ten years by the United States Constitution, namely, redrawing the congressional districts. The political parties will be provided an incentive to resolve political disagreements in the appropriate forum: the legislature."

Accordingly, the trial court denied any recovery of costs and fees pursuant to section 1988.

On appeal, the Atkinson plaintiffs assert that the trial court erred both in its determination that they had not "prevailed" and in its application of the "special circumstances" exception. The Perrin plaintiffs and intervenors also assert that the "special circumstances" exception is inapposite. We begin with the issue of prevailing party status under section 1988.

■ The Atkinson plaintiffs contend that they prevailed for purposes of section 1988, notwithstanding the court's rejection of their proposed plan, because they obtained a declaration that the existing districts were unconstitutionally malapportioned and an injunction against conducting congressional elections until the districts were redrawn.[3] Defendants counter that (1) they never disputed that the existing districts were unconstitutionally malapportioned, so the Atkinson plaintiffs' success on that question was, effectively, a foregone conclusion; and (2) the Atkinson plaintiffs lost on what was, in fact, the only contested issue—and, indeed, the "winner-takes-all" impetus for this litigation—the configuration of the redrawn districts.

Defendants' arguments are intuitively appealing. Nevertheless, under the analysis described by the United States Supreme Court, the Atkinson plaintiffs did, in fact, "prevail" for purposes of section 1988. *See Farrar v. Hobby*, 506 US 103, 113 S Ct 566, 121 L Ed 2d 494 (1992); *Texas Teachers Assn. v. Garland School Dist.*, 489 US 782, 109 S Ct 1486, 103 L Ed 2d 866 (1989).

■ Section 1988(b) provides:

"In any action or proceeding to enforce a provision of section * * * 1983 * * * of this title, * * * the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs * * *."

Congress enacted that statute in 1976 "to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 US 424, 429, 103 S Ct 1933, 76 L Ed 2d 40 (1983) (quoting HR Rep No 1558, 94th Cong, 2nd Sess (1976), 1).[4] Under section 1988, "a prevailing

---

[3] The trial court's judgment stated, in part:

"The court declares that, based on the 2000 census data, the current congressional district boundaries set forth in ORS 188.135 [(2001)] are unconstitutional. Defendants are permanently enjoined from administering, preparing for, or in any way permitting the nomination or election of the members of the United States House of Representatives from the malapportioned districts that currently exist in Oregon."

[4] Section 1988 was enacted in response to *Alyeska Pipeline Co. v. Wilderness Society*, 421 US 240, 95 S Ct 1612, 44 L Ed 2d 141 (1975), which reiterated the

plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley*, 461 US at 429 (internal quotation marks and citations omitted).

But who (or what) is a "prevailing party" for purposes of section 1988? That is, what are the legal requisites of "prevailing party" status? In *Texas Teachers Assn.*, the Court endorsed a "generous"—and arguably idiosyncratic— answer: A "prevailing party" under section 1988 is one who has "succeeded on *any* significant claim affording it *some* of the relief sought." 489 US at 791 (emphasis added).

In *Texas Teachers Assn.*, the plaintiffs sued under section 1983, challenging the constitutionality of the defendant school district's policy that denied the union's access to teachers on campus during school hours, allowed such access only before or after school and with principal approval, prohibited communications between teachers about employee organizations during the school day, and prohibited teachers from using intraschool communication systems for such discussions. On cross-motions for summary judgment, the district court ruled against plaintiffs on almost every claim. The court did find, however, that the prohibition against union meetings after school hours without prior approval was unconstitutionally vague. 489 US at 786. On appeal, the Fifth Circuit reversed in part, concluding, in addition, that the prohibitions on union-related discussions among teachers during the school day and on teacher use of internal communication systems for such discussions were also unconstitutional. *Id.* at 786. The Supreme Court "summarily affirmed" the Fifth Circuit. *Id.* at 787.

Following the Supreme Court's affirmance, the plaintiffs petitioned for attorney fees under section 1988. The district court denied the petition, and the Fifth Circuit affirmed. *Id.* Both courts applied the "central issue" test for prevailing party status,[5] holding that, notwithstanding the

---

principle that, in the absence of a statutory fee entitlement, litigants who had vindicated some broader public interest could not recover attorney fees. *Hensley*, 461 US at 429.

[5] Before *Texas Teachers Assn.*, the Fifth and Eleventh Circuits applied the "central issue" test to determinations of "prevailing" status under section 1988. *See, e.g., Simien v. City of San Antonio*, 809 F2d 255, 258 (5th Cir 1987); and

plaintiffs' "partial success" on the merits, they had not "prevailed," because the central issue of the litigation was "the constitutionality of the school district's policy of limiting employee organizations' access to teachers * * * during school hours." 489 US at 787.

The Supreme Court reversed. The Court first rejected the "central issue" test because it impermissibly required courts to gauge "the subjective importance of an issue to the litigants," 489 US at 791, and could not be reconciled with the broadly remedial congressional intent underlying section 1988. *Id.* Instead, the Court endorsed a more "generous formula," by which a party would be deemed to have "prevailed" if the party obtained "a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* at 792. Thus, the Court shifted the "touchstone" of the prevailing party inquiry from success on the "primary" issue, as viewed from the litigants' subjective perspective, to whether there has been a "material alteration of the legal relationship of the parties." *Id.* at 792-93.

One final aspect of *Texas Teachers Assn.* bears emphasis: The Court did *not* hold that a party's success (or failure) on the "central" or "primary" issue was immaterial for all fee-related purposes. Rather, that consideration pertains solely to the *reasonableness* of the requested fees and "not to the availability of a fee award *vel non.*" *Id.*

In *Farrar*, the Court reiterated and refined its "prevailing party" formulation. There, the plaintiffs sought $17 million in damages for an alleged civil rights violation. After the jury found that the defendant had violated the plaintiffs' civil rights, but was not the proximate cause of their alleged injuries, the trial court ultimately entered a judgment against the defendant but awarded only nominal damages. *Farrar*, 506 US at 106-07. The plaintiffs then petitioned for

---

*Martin v. Heckler*, 773 F2d 1145, 1149 (11th Cir 1985) (en banc). The majority of federal circuits applied a less demanding standard. *See, e.g., Gingras v. Lloyd*, 740 F2d 210, 212 (2d Cir 1984); *Lampher v. Zagel*, 755 F2d 99, 102 (7th Cir 1985); *Fast v. School Dist. of Ladue*, 728 F2d 1030, 1032-33 (8th Cir 1984) (en banc); *Lummi Indian Tribe v. Oltman*, 720 F2d 1124, 1125 (9th Cir 1983); *Nephew v. City of Aurora*, 766 F2d 1464, 1466 (10th Cir 1985), *cert den*, 485 US 976 (1988). In *Texas Teachers Assn.*, the Supreme Court granted *certiorari* to resolve the "conflicting views in the Courts of Appeals." 489 US at 784.

attorney fees under section 1988. The trial court awarded fees, but the Fifth Circuit, based on its understanding of *Texas Teachers Assn.*, reversed:

> " 'The Farrars sued for $17 million in money damages; the jury gave them nothing. No money damages. No declaratory relief. No injunctive relief. * * * The Farrars did succeed in securing a jury-finding that Hobby violated their civil rights and a nominal award of one dollar. However, this finding did not in any meaningful sense change the legal relationship between the [parties]. Nor was the result a success for the Farrars on a significant issue that achieved some of the benefit the [plaintiffs] sought in bringing suit. When the sole relief sought is money damages, we fail to see how a party prevails by winning one dollar out of the $17 million requested.' "

*Id.* at 107-08 (quoting *Estate of Farrar v. Cain*, 941 F2d 1311, 1315 (5th Cir 1991)) (citations and internal quotation marks omitted).

The Supreme Court affirmed the Fifth Circuit judgment because the only reasonable fee, considering "the degree of success obtained" by the plaintiffs, was no fee. 506 US at 114-15. However, the Court held that the Fifth Circuit erred in "failing to recognize that [the plaintiffs] were prevailing parties." *Id.* at 116. Specifically, the Court clarified and amplified its observation in *Texas Teachers Assn.* that, "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some of the relief on the merits of his claim." *Id.* at 111. Under that standard, even if a plaintiff unsuccessfully sought substantial monetary damages but recovered only nominal damages, the plaintiff was, nevertheless, a "prevailing party" because he "modifie[d] the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." *Id.* at 113. In sum, as the Court emphasized, "the prevailing party inquiry does not turn on the magnitude of the relief obtained." *Id.* at 114.

Finally, *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 US 598, 121 S Ct 1835, 149 L Ed 2d 855 (2001), is also instructive. In that case, the defendants ordered the closure of the plaintiffs' residential care home after the home failed an

inspection due to a violation of a West Virginia "self-preservation" statute.[6] The plaintiffs filed suit under the Fair Housing Amendments Act (FHAA) and the Americans with Disabilities Act (ADA), seeking declaratory and injunctive relief against the enforcement of that statute. Before trial, however, the state legislature repealed the "self-preservation" law, and the case was dismissed as moot. *Id.* at 600-02. The plaintiffs then petitioned for attorney fees, and the district court denied that petition.[7] The Fourth Circuit affirmed that denial. *Id.* at 602.

The Supreme Court also affirmed the denial of fees and, specifically, rejected the plaintiffs' contention that they were entitled to attorney fees under a "catalyst" theory. The Court reiterated that the controlling test of "prevailing party" status is whether there is a *"court-ordered* 'change [in] the legal relationship between [the plaintiff] and the defendant.' " 532 US at 604 (quoting *Texas Teachers Assn.*, 489 US at 792) (emphasis added; brackets in *Buckhannon*). Thus, while the defendants' voluntary repeal of the statute "perhaps" accomplished what the plaintiffs had sought in filing their claims, without a judgment on the merits the defendants' change in conduct still "lack[ed] the necessary judicial *imprimatur.*" Consequently, the plaintiffs had failed to secure the requisite judicially mandated "alteration in the legal relationship of the parties." *Id.* at 605.[8]

Under the "prevailing party" standard prescribed in *Texas Teachers Assn., Farrar,* and *Buckhannon,* the Atkinson plaintiffs prevailed in this litigation. They did, in

---

[6] A "self-preservation" statute requires that all residents of care homes be capable of physically removing themselves from dangerous situations such as fires. *Buckhannon,* 532 US at 600.

[7] The fee petitions were brought under the FHAA's attorney fee provision, 42 USC section 3613(c)(2), and a comparable provision of the ADA, 42 USC section 12205. Both provisions allow an award of reasonable fees to the "prevailing party." Section 1988 is "nearly identical," and thus the Court has "interpreted these fee-shifting provisions consistently." *Buckhannon,* 532 US at 603 n 4.

[8] At a practical level, at least, the results in *Farrar* and *Buckhannon* might, respectfully, be deemed incongruous: In *Farrar,* the plaintiffs, who sought millions of dollars in damages and obtained only nominal relief, "prevailed," and in *Buckhannon,* the plaintiffs, who obtained total, albeit unadjudicated, success, did not "prevail."

fact, succeed on a significant claim in the litigation, pertaining to the unconstitutional malapportionment of the existing districts, and they obtained a judgment granting them "some of the relief sought." *Texas Teachers Assn.*, 489 US at 791. Specifically, as noted, the trial court here declared that the 1991 congressional districts were unconstitutional and enjoined future elections based on those districts. *See* 191 Or App at 447 n 3. That declaration and injunction effected a "material alteration of the legal relationship of the parties." *Texas Teachers Assn.*, 489 US at 792-93. To be sure, the Atkinson plaintiffs failed to obtain the precise relief that they sought. But "the magnitude of the relief obtained" is immaterial to the determination of prevailing party status. *Farrar*, 506 US at 114.

Defendants argue, nevertheless, that we, like the trial court, should adopt the analysis of the Seventh Circuit in *Hastert*, in which the court held that certain plaintiffs whose circumstances were virtually identical to those of the Atkinson plaintiffs had not prevailed in redistricting litigation. We decline to follow *Hastert* in that regard.

In *Hastert*, several groups of plaintiffs brought actions seeking the redrawing of congressional districts after the Illinois legislature and governor were unable to agree on a plan to correct malapportioned congressional districts. As in this case, one group (the Hastert plaintiffs) advocated for the Republican-sponsored plan, and another (the Rosebrook plaintiffs) urged the adoption of the Democratic-sponsored plan. Ultimately, the district court adopted the Republican (Hastert) redistricting plan as better satisfying constitutional and statutory criteria. *Hastert*, 28 F3d at 1435. Both groups of plaintiffs sought attorney fees. The district court declined the awards, determining, specifically, that the Hastert plaintiffs had prevailed, but should be denied fees under the "special circumstances" exception. *Id.* at 1443.

The Seventh Circuit held that the Rosebrook plaintiffs had not prevailed:

"[R]edistricting cases like this one are unlike ordinary voting rights cases. As we have noted, in the redistricting

context the touchstone for whether a party 'prevails' is simply whether that party's map (or the map the party ultimately embraces) is ultimately adopted. We thus have relatively little difficulty concluding that the Rosebrook plaintiffs are not prevailing parties, and thus not entitled to attorneys' fees."

*Id.* at 1443.[9]

In so holding, however, the court failed to persuasively address how that result could be squared with the "prevailing party" standard prescribed in *Texas Teachers Assn.* and *Farrar*. The *Hastert* majority did not even mention *Farrar*, and the court's limited discussion of *Texas Teachers Assn.* was inconsistent with its observation that, in redistricting cases,

"the winner, at least from a lay person's perspective, is the litigant whose plan * * * the district court adopted. Conveniently, this common-sense understanding of winners and losers coincides in large part with the Supreme Court's definition of 'prevailing party.' "

*Hastert*, 28 F3d at 1439.

We respectfully disagree. Considerations of "common sense" notwithstanding, *Hastert*'s "prevailing party" disposition does not "coincide"—"in large part" or otherwise—with the Supreme Court's "prevailing party" standard. Rather, *Hastert*'s "lay person's perspective" approach is a surrogate for the "primary issue" formulation that *Farrar* repudiated.

We note, finally, with respect to "prevailing party" status, that *Hastert* is contrary to the overwhelming majority of reported decisions that have addressed "prevailing party" status in section 1983 redistricting litigation. Although the circumstances of those cases vary, to a greater or lesser degree, from those presented here, they consistently conclude that success on the threshold question of unconstitutional

---

[9] The *Hastert* majority also reversed the district court's application of the "special circumstances" exception and held that the Hastert plaintiffs were entitled to recover reasonable attorney fees. We address that matter in detail below. *See* 191 Or App at 454.

malapportionment suffices to confer "prevailing party" status, regardless of the ultimate remedy.[10]

Those decisions, and their underlying reasoning, correspond with and corroborate our own understanding of the requirements of "prevailing party" status as defined by Supreme Court precedent. We thus conclude that the trial court erred in determining that the Atkinson plaintiffs did not "prevail."

■ The question remains, however, whether, notwithstanding their "prevailing party" status, the parties here are subject to the "special circumstances" exception to entitlement to fees under section 1988. *See Hensley*, 461 US at 429 (court "should ordinarily" award attorney fees "unless special circumstances would render such an award unjust" (internal quotations and citations omitted)).

Here, the trial court relied heavily on Judge Coffey's dissenting opinion in *Hastert* in concluding that the "special circumstances" exception applied. *See* 191 Or App at 445-46. That was so for several interrelated reasons: (1) This litigation was necessitated only because members of the legislature, motivated by partisan interests, were unwilling or unable to discharge their "constitutionally-imposed duty" to

---

[10] *See, e.g., In re Kansas Congress. Dist. Reapportionment Cases*, 745 F2d 610, 612 (10th Cir 1984) ("[B]oth sets of plaintiffs succeeded in invalidating the existing congressional districts and in having the district court adopt a constitutionally permissible reapportionment plan."); *Ramos v. Koebig*, 638 F2d 838, 845 (5th Cir 1981) (city council admitted unconstitutionality of existing plan and agreed to injunction, nonetheless party whose plan was not adopted "prevailed" as obtaining principal relief prayed for); *Johnson v. Mortham*, 950 F Supp 1117, 1121 (ND Fla 1996) (plaintiffs who objected to redistricting plan that court ultimately adopted nevertheless "prevailed" because they "fully succeeded in their suit to strike down" the unconstitutional plan); *Doulin v. White*, 549 F Supp 152, 154 (D Ark 1982) (party whose suit prevents unconstitutional plan from taking effect is a prevailing party because the constitution "is vindicated every bit as much by preventing an invalid law from going into effect, as by preventing such a law from continuing in effect"); *Goddard v. Babbitt*, 547 F Supp 373, 375 (D Ariz 1982) (in reaching settlement on redistricting plan, all parties "played an instrumental role" and "received a significant amount of the relief that they prayed for" and, thus, "prevailed"); *Connor v. Winter*, 519 F Supp 1337, 1342 (SD Miss 1981) (although redistricting plan ultimately adopted was promulgated by the legislature, the plaintiffs "prevailed" because their suit "provided the initial impetus for the process that eventually brought to fruition the statutory reapportionment"). *Contra Navajo Nation v. Arizona Independent Redistricting*, 286 F Supp 2d 1087, 1094 (D Ariz 2003) ("Where all parties from the outset of the litigation agreed on an issue, it is not a significant issue warranting an award of attorney's fees.").

redraw the malapportioned districts; (2) thus, the interests represented in this litigation were, effectively, the same interests that were responsible for the failure to enact redistricting legislation; (3) given that alignment and juxtaposition of interest, this case, unlike many voting rights cases, was not maintained to vindicate the rights of "a disenfranchised group of voters" but was, instead, "a turf war between the two well-funded major political parties" who were "solely concerned with gaining and/or maintaining political advantage"; (4) because defendants had "acknowledged the need to redraw lines from the outset," an award of fees here would not promote the statutory policy of inducing compliance with the law; and (5) rather, an award of attorney fees would merely shift the "cost to the taxpayers"—whereas a denial of fees would encourage "those participating in the legislative process to accomplish the task entrusted to them."

We deeply appreciate the trial court's thoughtful analysis. Nevertheless, with respect, we disagree.

We note, by way of context, that there have been at least 11 reported redistricting cases in which the defendants attempted to invoke the "special circumstances" exception to fee entitlement under section 1988. In each of those cases, the court ultimately concluded that that exception was inapposite in this context. *See Hastert*, 28 F3d at 1443-44 (district court erred in determining that "special circumstances" exist. Although it is "regrettable" that the legislature did not pass a redistricting plan and that the taxpayers "must now pay for their dereliction[,] * * * such is the case whenever the political branches of government fail to vindicate important rights and the affected parties must seek a judicial hearing."); *Criterion Club of Albany v. Board of Com'rs, etc.*, 594 F2d 118, 120 (5th Cir 1979) (court refused to "endorse the denial of attorney's fees because the burden of an award for a discriminatory system * * * might fall on [taxpayer's] shoulders"); *Navajo Nation*, 286 F Supp 2d at 1096 (position of "good faith" defendant state secretary of state is "untenable" because no case has adopted *Hastert* dissent); *Daggett v. Kimmelman*, 617 F Supp 1269, 1276 (D NJ 1985), *aff'd in part, rev'd in part*, 811 F2d 793 (3d Cir 1987) ("fact that the remedy stage was not completely untainted by political

issues does not preclude plaintiffs from recovering an attorney's fee award for vindicating constitutional rights"); *Doulin v. White*, 549 F Supp 152, 155 (D Ark 1982) (no special circumstances justify denying fee award where the plaintiffs' action resulted in invalidation of existing districts and adoption by court of new apportionment scheme); *Goddard v. Babbitt*, 547 F Supp 373, 376 (D Ariz 1982) (no special circumstances render fee award "inequitable" and, further, "it would be absurd to suggest that this suit, involving important constitutional rights, is not the type of case where an award would further congressional aims"); *Connor v. Winter*, 519 F Supp 1337, 1343 (SD Miss 1981) ("When bringing a constitutional attack on a state statute, plaintiffs routinely sue the executive officer charged with responsibility for enforcing the legislative policy, even though the [officer] neither enacted the disputed statute nor possesses the power unilaterally to repeal it * * * [t]hat the [officer is] powerless to effect a legislative reapportionment does not affect [his] liability for attorney's fees.").[11]

That body of contrary federal authority is not, of course, conclusive, as the trial court here recognized. *See, e.g., Shaw v. PACC Health Plan, Inc.*, 322 Or 392, 402 n 8, 908 P2d 308 (1995).[12] And yet, that consensus is cautionary. *Id.*

---

[11] *See also In re Kansas Congress. Dist. Reapportionment Cases*, 745 F2d at 613 (secretary of state's "assurance that he would not enforce the existing unconstitutional districts and that he would file his own lawsuit to correct the situation amounts to no more than an assertion that he acted in good faith, which is not a special circumstance"); *Ramos*, 638 F2d at 845-46 (special circumstances did not exist although the defendants were in process of devising new redistricting plan when the plaintiffs filed suit and claimed that award of fees would unfairly penalize a "good faith" defendant); *Johnson*, 950 F Supp at 1122 (the defendant's "good faith" argument did not demonstrate "strong showing" of special circumstances); *Major v. Treen*, 700 F Supp 1422, 1427 (ED La 1988) (the "defendants have not presented any 'special circumstances' which would justify a denial of attorneys' fees in this case").

[12] In *Shaw*, the court explained:

"Because the Supreme Court has not spoken to the issue, we ordinarily would next look to the federal courts to determine whether they have interpreted the same issue under ERISA as that presented here. When the federal courts are well-settled on a specific interpretation, this court may choose to follow that interpretation, if the underlying reasoning is persuasive. However, federal court decisions, other than those issued by the Supreme Court, are not binding on this court."

322 Or at 402 n 8 (citations omitted).

In all events, the trial court's reasoning was predicated on several erroneous, or ultimately immaterial, premises. First, it may well be true that plaintiffs were selfishly motivated in bringing this action. But that hardly distinguishes this action from many, probably most, section 1983 actions: Efforts to vindicate constitutionally protected rights are often "selfishly" motivated. *See, e.g., Farrar; Texas Teachers Assn.* That the selfish interests here were "partisan" in nature is immaterial.

Nor, as defendants suggest, were they merely "nominal" defendants—innocent bystanders to a political "turf war" "fought solely among the plaintiffs and intervenors." That contention, which the trial court implicitly accepted, posits a remarkable distinction between the State of Oregon and the Oregon Legislature—*i.e.*, that the state defendants would have corrected the unconstitutional malapportionment but for the legislature's politically motivated failure to do its duty. That distinction—treating the legislature as some sort of alien "other"—is legally and constitutionally unsupportable. Beyond that, we are hard-pressed to understand how, or why, the conduct of legislators in proposing, opposing, and approving redistricting legislation can, or should be, castigated as being irresponsibly partisan without ascribing the same sort of "partisan blame" to the defendant governor's veto of that legislation.

Ultimately, the exercise of examining the actors' motivations and ascribing blame is illusory and self-defeating. Did Republican legislators, who held majorities in both houses, "fail to fulfill their constitutional duty" when they proposed and adopted redistricting legislation that the parties agree comported with constitutional requirements? Did Democratic legislators (and the governor) similarly breach their constitutional obligations when they opposed (and vetoed) that plan, adhering to their own redistricting plan—a plan that not only met constitutional requirements but also, as the trial court ultimately determined, better complied with the requirements of ORS 188.010? There may well be plenty of "blame," or justification, for the 2001 redistricting deadlock. But, given our constitutional role, we are loath to ascribe either.

What is undisputable is that the political process was deadlocked on congressional redistricting. It is also beyond reasonable dispute that, but for the filing of this litigation (or substantially similar litigation), the unconstitutionally malapportioned districts would have remained uncorrected. Thus, the parties in bringing this action—for whatever reasons—served to vindicate the constitutional interests of all Oregon voters. Those realities render the "special circumstances" exception inapposite. *See, e.g.*, *Hastert*, 28 F3d at 1443-44; *In re Kansas Congress. Dist. Reapportionment Cases*, 745 F2d at 612; *Navajo Nation*, 286 F Supp 2d at 1096.[13]

Finally, we acknowledge, as defendants emphasize, that most of plaintiffs' and intervenors' efforts here were devoted to litigating which of their proposed plans best comported with the considerations prescribed in ORS 188.010(1). Defendants contend that, given that focus, this dispute was, in the end, predominantly statutory and not constitutional, precluding any entitlement to fees under section 1988. We disagree. Constitutional right and remedy under section 1983 cannot be so easily divorced. Here, meaningful vindication of plaintiffs' constitutional rights necessitated judicial intervention and prescription of constitutionally apportioned districts comporting with ORS 188.010. As the Perrin plaintiffs argue:

"As defendants see it, after they admitted that the then-existing congressional districts violated the federal constitution, there was no need to remedy the violation.

---

[13] Defendants contend, and the trial court agreed, that awarding attorney fees here would unfairly shift the cost of this litigation to the citizens of Oregon. However, as noted, the same citizens enjoyed the benefit of the trial court's judgment. *Accord American Booksellers Ass'n v. Com. of Va.*, 802 F2d 691, 697 (4th Cir 1986), *vac'd and rem'd on other grounds*, 488 US 905 (1988) ("Although the [plaintiffs] certainly benefit from the results of this litigation, the citizens of Virginia will likewise continue to enjoy unfettered freedom of expression. We do not find it unjust that the taxpayers will have to bear the costs of the award.").

Defendants also contend, and the trial court agreed, that denying fees here would effectively reduce the incentive for future similar litigation—or, conversely, induce the major political parties to work out their differences in the political process rather than pursuing litigation in which they would be required to bear their own costs. We fail to see why that would necessarily be so. There is no evidence in this record that supports such an inference—and, indeed, the parties' vigorous prosecution of this litigation notwithstanding the uncertainty of any fee recovery strongly suggests that, when the political stakes are sufficiently great, the cost of litigation is, within reasonable limits, immaterial.

Without this litigation, however, there would have been no constitutional congressional plan under which Oregonians could vote.

"* * * * *

"* * * Once the trial court found that the then-existing congressional districts violated Article I, section 2, a remedy—a new plan—was necessary. Because the political process had been unable to enact a constitutionally permissible redistricting plan, the Perrin plaintiffs had to step in to remedy the existing constitutional violation."

That was equally true of intervenors and the Atkinson plaintiffs. Significantly, defendants took no position on remedy, essentially abdicating that role—and the task of assisting the court in fashioning a lawful plan—to plaintiffs and intervenors.

We thus conclude that plaintiffs and intervenors are entitled to recover attorney fees under section 1988. We remand for the trial court to determine the reasonableness of those parties' requested fees, considering, *inter alia*, the parties' relative degree of success and the extent to which their efforts assisted the court in identifying the appropriate remedy. *See, e.g., Texas Teachers Assn.*, 49 US at 792-93; *Hensley*, 461 US at 430, 435-36; *Johnson v. Georgia Highway Express, Inc.*, 488 F2d 714, 717-19 (5th Cir 1974).

Reversed and remanded.